**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| THE J.M. SMUCKER COMPANY, | ) | Case No. 5:23-cv-00607-JRA |
| | ) | |
| Plaintiff, | ) | Judge John R. Adams |
| | ) | |
| v. | ) | |
| | ) | |
| ACE AMERICAN INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

---

**BRIEF ON BEHALF OF PLAINTIFF, THE J.M. SMUCKER COMPANY, IN SUPPORT
OF ITS RULE 56 MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

## **TABLE OF CONTENTS**

I.    STATEMENT OF THE ISSUE TO BE DECIDED ........................................ 1

II.    SUMMARY OF ARGUMENT ........................................................ 1

III.    STATEMENT OF FACTS ......................................................... 5

    A.    Smucker Purchased General Liability Policies from ACE .................... 5

    B.    The Underlying Claims Allege Damages from *Salmonella*
        Contamination .................................................................... 6

    C.    ACE Refused to Pay for Smucker's Defense of the Underlying Claims .............. 7

IV.    ARGUMENT .................................................................... 8

    A.    The Duty to Defend and Summary Judgment Standards ....................... 8

    B.    The Underlying Claims Arise from a Single Occurrence Because, as
        ACE Admits, They All Arise from the Same "Cause" ......................... 10

    C.    ACE's Efforts to Avoid the Consequences of Its Own Coverage
        Admissions Fail ................................................................. 11

        1.    The Batching Endorsement on Which ACE Relies Can
            Reasonably Be Interpreted to Decrease, but not Increase, the
            Number of Occurrences and Retained Limits ........................... 12

        2.    Contrary to ACE's Contentions, Claims Arising from the Same
            Cause Constitute a Single Occurrence ................................... 14

V.    CONCLUSION ................................................................. 20

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ACE Euro. Grp., Ltd. v. Abercrombie & Fitch Co.*,
 621 F. App'x 338 (6th Cir. 2015) .........................................................................10

*Babcock & Wilcox Co. v. Arkwright-Boston Mfg. Mut. Ins. Co.*,
 53 F.3d 762 (6th Cir. 1995) ...............................................................................18

*Big Lots Stores, Inc. v. Am. Guarantee & Liab. Ins. Co.*,
 240 F. Supp. 3d 725 (S.D. Ohio 2017) ..........................................................11, 18

*Cincinnati Ins. Co. v. ACE INA Holdings, Inc.*,
 175 Ohio App. 3d 266 (Ohio Ct. App. 2007) ....................................................18

*Clements v. Aetna Cas. & Sur. Co.*,
 15 Ohio Misc. 252 (Ohio Com. Pl. 1968) .........................................................18

*ConAgra Foods, Inc. v. Lexington Ins. Co.*,
 21 A.3d 62 (Del. 2011) ............................................................................ *passim*

*ConAgra Foods, Inc. v. Lexington Ins. Co.*,
 Case No. SN09C-02-170 (Del. Super. Ct., Nov. 30, 2012) ...................................12

*Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.*,
 609 A.2d 440 (N.J. Super. App. Div. 1992) .........................................................13

*Doe v. Sherwin*,
 2015-Ohio-2451 (Ohio Ct. App. 2015)..................................................................9

*FirstEnergy Generation, LLC v. Valley Forge Ins. Co.*,
 487 F. Supp. 3d 630 (N.D. Ohio 2020)...................................................................9

*George H. Olmsted & Co. v. Metro. Life Ins. Co.*,
 118 Ohio St. 421 (1928)................................................................................14, 18

*Goodyear Tire and Rubber Co. v. Hartford Acc. and Indem. Co.*,
 2005 WL 6244202 (W.D. Pa. 2005) ...............................................................16, 18

*Goolsby v. Best in Neighborhood, LLC*,
 563 F. Supp. 3d 726 (N.D. Ohio 2021)...............................................................18

*Int'l Surplus Lines Ins. Co. v. Certain Underwriters and Underwriting Syndicates
    at Lloyd's of London*,
 868 F. Supp. 917 (S.D. Ohio 1994) ...............................................................16, 18

ii

*Libbey Inc. v. Factory Mut. Ins. Co.*,
  2007 WL 9757792 (N.D. Ohio 2007) ...........................................................16, 18

*LuK Clutch Sys., LLC v. Cent. Indem. Co.*,
  805 F. Supp. 2d 370 (N.D. Ohio 2011)..........................................................17, 18

*Morton Thiokol, Inc. v. Aetna Casualty & Surety Co.*,
  1988 WL 1520456 (Ohio Ct. C.P. 1988), *rev'd on other grounds,* 1991 WL
  201651 (Ohio Ct. App. 1991) ........................................................................16, 18

*MTD Products, Inc. v. Allied World Assurance Co.*,
  2018 WL 2447408 (Ohio Com. Pl. 2018)..................................................15, 16, 18

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Donaldson Co., Inc.*,
  926 F.3d 1014 (8th Cir. 2019) .............................................................................13

*Nationwide Mutual Ins. Co. v. Lafarge Corp.*,
  Civ. Nos. H-90-2390, H-93-4173, Bench Op. (D. Md. Oct. 31, 1995) ...................13

*Naythan A. Ward v. J.M. Smucker Co.*,
  Case No. 5:22-cv-00885-JRA .................................................................................6

*Ohio Govt. Risk Mgt. Plan v. Harrison*,
  115 Ohio St. 3d 241 (2007)....................................................................................9

*Owens-Illinois, Inc. v. Aetna Cas. and Sur. Co.*,
  597 F. Supp. 1515 (D.D.C. 1984) ...................................................................16, 18

*Parker Hannifin Corp. v. Steadfast Ins. Co.*,
  445 F. Supp. 2d 827 (N.D. Ohio 2006)....................................................11, 15, 18

*Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*,
  112 Ohio St. 3d 482 (2006)....................................................................................9

*Republic Underwriters Ins. Co. v. Moore*,
  493 F. App'x 907 (10th Cir. 2012) .......................................................................17

*Scott Fetzer Co. v. Zurich Am. Ins. Co.*,
  769 F. App'x 322 (6th Cir. 2019) ................................................................. *passim*

*Stonewall Ins. Co. v. E.I. DuPont De Nemours & Co.*,
  996 A.2d 1254 (Del. 2010) ....................................................................................4

*Travelers Cas. Ins. Co. of Am. v. Mediterranean Grill & Kabob Inc.*,
  499 F. Supp. 3d 371 (W.D. Tex. 2020)..................................................................17

*U.S. Specialty Ins. Co. v. Drake Aerial Enters., LLC*,
  328 F. Supp. 3d 781 (N.D. Ohio 2018)..................................................................13

iii

*Union Carbide Corp. v. Travelers Indem. Co.*,
    399 F. Supp. 12 (W.D. Pa. 1975) ........................................................................13

*Ward v. Custom Glass & Frame, Inc.*,
    663 N.E.2d 734 (Ohio Ct. App. 1995) .................................................................9

*Westfield Cos. v. O.K.L. Line*,
    2001 WL 35905718 (Ohio Com. Pl. 2001) ..........................................................9

*Westfield Ins. Co. v. Cont'l Ins. Co.*,
    2015 WL 1549277 (N.D. Ohio 2015) .............................................................17, 18

*William Powell Co. v. Onebeacon Ins. Co.*,
    2016-Ohio-8124 (Ohio Ct. App. 2016) ..........................................................17, 18

*Willoughby Hills v. Cincinnati Ins. Co.*,
    9 Ohio St. 3d 177 (1984) .....................................................................................9

*World Harvest Church v. Grange Mut. Cas. Co.*,
    148 Ohio St. 3d 11 (2016) ..................................................................................15

## Other Authorities

Abraham & Schwarcz, INSURANCE LAW AND REGULATION, Chapter 6 (6th ed.
    2015) ......................................................................................................................5

Fed. R. Civ. P. 56(a) .....................................................................................................8

Fed. R. Civ. P. 12(c) ...................................................................................................10

11 WILLISTON ON CONTRACTS, § 30:19 (4th ed. 2023) .............................................13

## I.     <u>STATEMENT OF THE ISSUE TO BE DECIDED</u>

The parties agree that two insurance policies (the "Policies") that Plaintiff The J.M. Smucker Company ("Smucker") purchased from Defendant ACE American Insurance Company ("ACE") obligate ACE to reimburse Smucker for Smucker's costs in defending against claims arising from the alleged *Salmonella* contamination of certain Jif®-branded peanut butter (the "Underlying Claims") once Smucker satisfies the Policies' retained limits (which are like deductibles). The only issue presented in this Motion is whether ACE must pay any defense costs once Smucker satisfies a single retained limit of $250,000 per Policy; or, as ACE contends, whether Smucker must satisfy potentially up to 225 separate retained limits per Policy (up to $112,500,000 under both Policies) before ACE must reimburse Smucker for any defense costs.

## II.    <u>SUMMARY OF ARGUMENT</u>

This is an insurance coverage action arising from ACE's refusal to meet its coverage obligations to Smucker under the Policies.[1] The parties agree that ACE has a duty to reimburse Smucker for defense costs under the Policies once Smucker satisfies a single $250,000 retained limit for each "occurrence" as the Policies define that term. (A "retained limit" is like a deductible in that the policyholder must pay that amount before coverage applies.)

Notably, ACE admits that the Policies obligate ACE to pay for Smucker's defense against the Underlying Claims. ACE nonetheless refuses to provide Smucker with a defense in the Underlying Claims at this time. Specifically, ACE disputes that the Underlying Claims result from a single "occurrence," which would require ACE to pay Smucker's defense costs once Smucker satisfies a single $250,000 retained limit per Policy. Instead, ACE erroneously argues that the

---

[1] True and correct copies of the Policies are attached as Exhibits A & B to the Declaration of Matthew Chiricosta, dated August 4, 2023 (the "Decl."), which is attached here as Exhibit 1.

Policies require Smucker to pay a separate $250,000 retained limit for each "lot" of recalled product. Because, in ACE's view, the Underlying Claims involve up to 225 "lots" of Jif®-branded peanut butter, ACE thus effectively contends that Smucker must pay as much as $112,500,000 (that is, 225 separate retained limits of $250,000 each, for each of the two Policies) before ACE must pay a single dollar of defense costs to Smucker. As a practical matter, ACE's position means that it will likely never have to fund any defense expenses, even though ACE admits that the Underlying Claims otherwise trigger ACE's defense obligations to Smucker.

As set forth below, the Court should reject ACE's position and grant partial summary judgment to Smucker ordering ACE to reimburse Smucker for defense costs once Smucker has satisfied a single $250,000 retained limit per Policy.

The determination of an insurer's defense duty is an issue of law. Further, Ohio law sets a low bar for defense obligations: Smucker must show only that the Underlying Claims assert "potentially" or "arguably" covered claims and that Smucker's interpretation of the Policies is reasonable, even if there are other reasonable policy interpretations. This low bar reflects Ohio's emphasis on ensuring that the defense duty applies broadly and any uncertainty is resolved in the policyholder's favor. ACE, by contrast, may evade its defense duty only if its coverage-eviscerating position—that Smucker must satisfy the $250,000 retained limit up to 225 times per Policy—is the ***only*** reasonable interpretation of the Policies, and that Smucker's interpretation is unreasonable as a matter of law. As set forth below, Smucker meets its burden; ACE cannot.

Specifically, Smucker's interpretation of the Policies is reasonable because the alleged bodily injuries at issue in the Underlying Claims were caused, at least potentially, by a single occurrence, and thus are subject to only one $250,000 retained limit. The Policies define "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the

same general harmful conditions." Decl., Exs. A & B, at 66. In calculating the number of occurrences in this context, Ohio courts look to the underlying "cause or causes of the damage or injury, rather than . . . the number of individual claims." *Scott Fetzer Co. v. Zurich Am. Ins. Co.*, 769 F. App'x 322, 328 (6th Cir. 2019) (memorandum opinion). Ohio's "cause test" treats the relevant occurrence, for purposes of determining coverage under an insurance policy, as the "cause" of the chain of events that led to the injury.

ACE has ***already admitted*** that "all of the 'bodily injury' and 'property damage' asserted in the Underlying Claims 'arises from the substantially same general harmful condition, cause, defect, error or suspected deficiency – namely, salmonella contamination.'" ECF No. 11, ACE Answer, ¶ 41. In other words, ACE admits that the injuries alleged in the Underlying Claims arise "from the substantially same … cause"—"salmonella contamination." This alone is sufficient for the Court to hold, as a matter of law, that Smucker's interpretation of the Policies—that the allegations in the Underlying Claims, at least potentially, arise from only one "cause" and thus one occurrence—is reasonable. Indeed, this is how courts typically determine the number of occurrences in comparable contexts. *See infra*, Section IV.B.

Nonetheless, ACE claims it has no coverage obligation based on an incorrect interpretation of Policy language in a batching endorsement that ACE itself included in the Policies, but that courts repeatedly have refused to construe in the way ACE advocates. For instance, more than a decade before ACE wrote the Policies at issue here, the Delaware Supreme Court faced a dispute between an insurer and a peanut butter manufacturer that involved virtually identical facts, policy

language, arguments, and law.[2] *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62 (Del. 2011) (*en banc*).

In *ConAgra*, the insured, just like Smucker, made peanut butter at a single facility over an extended period during which the peanut butter allegedly became contaminated with *Salmonella* and, as a result, the insured faced thousands of consumer claims. *Id.* at 66. As ACE does here, ConAgra's insurer relied on a nearly identical batching endorsement to claim its coverage obligations would only arise after the insured satisfied numerous, separate per-occurrence retained limits that could total hundreds of millions of dollars. *Id.* at 66–67. The Delaware Supreme Court rejected this argument, ruling that the insurer's duty to defend was triggered as soon as the insured had paid a single retained limit, notwithstanding the batching endorsement in the policy (which the Court found to be ambiguous) or the fact that the claims arose from thousands of individual claimants. *Id.* at 73.

The same result should hold here. Simply put, ACE is a sophisticated insurance company that cannot avoid its coverage obligations by twisting Policy language that it wrote to eviscerate the Policy's coverage, particularly when it drafted the Policies' language long after multiple courts, in *ConAgra* and other cases discussed below, definitively held that that same language on which ACE relies reasonably means the opposite of what ACE now advocates.

For all these reasons, Smucker is entitled to partial summary judgment holding that ACE's obligations to reimburse Smucker for defense costs under each Policy are triggered upon Smucker's satisfaction of a single $250,000 retained limit per Policy, because the Underlying Claims potentially or arguably fall within the scope of coverage and arise from a single occurrence.

---

[2] Delaware, like Ohio, applies the "cause test" to determine the number of occurrences. *Stonewall Ins. Co. v. E.I. DuPont De Nemours & Co.*, 996 A.2d 1254, 1257–58 (Del. 2010); *see infra* Section IV.C.2.

### III.    STATEMENT OF FACTS

### A.    Smucker Purchased General Liability Policies from ACE

Smucker makes, among other things, Jif®-branded peanut butter products. ECF No. 11, ACE Answer, ¶ 9. For years, Smucker purchased general liability insurance policies from ACE to protect itself against potential risks from its business, including liability arising from alleged bodily injuries caused by Smucker's products. *See id.* at ¶ 2. As relevant here, Smucker paid hundreds of thousands of dollars in premiums to purchase two successive comprehensive general liability insurance policies from ACE, with policy periods from May 1, 2021-May 1, 2022, and May 1, 2022-May 1, 2023. Decl., Exs. A & B, at 23.

Each Policy obligates ACE to cover Smucker's defense costs (referred to as "Allocated Loss Adjustment Expense[s]" in the Policies) for claims "because of 'bodily injury'" so long as that injury is "caused by an 'occurrence[.]'" *Id.* at 49. This obligation triggers once Smucker has first paid a "retained limit" of $250,000 for "each occurrence." *Id.* at 24.

Each Policy defines "occurrence" to mean "an accident, including continuous **or repeated exposure** to substantially the same general harmful conditions." *Id.* at 66 (emphasis added). As one treatise notes, insurers include the "continuous or repeated exposure to substantially the same general harmful conditions" language to make "it clear that damage need not occur at a single point in time in order to be covered[.]" Abraham & Schwarcz, INSURANCE LAW AND REGULATION, Chapter 6 (6th ed. 2015). Thus, claims involving multiple claimants and/or injuries that result from the same general harmful cause or condition—here, as ACE admits, that cause is "salmonella contamination"—arise from a single occurrence. ECF No. 11, ACE Answer, ¶ 41.

Each Policy also contains a Lot or Batch Clause Endorsement (the "Batching Endorsement"), which states in relevant part:

Any "bodily injury" or "property damage" that:

A.      Is included in the "products-completed operations hazard";

B.      Arises from the substantially same general harmful condition, cause, defect, error or suspected deficiency; and

C.      Arises out of any one "lot" of "your product" that is prepared or acquired by you;

shall be considered as a single "occurrence". Such "occurrence" shall be deemed to occur when the "bodily injury" or "property damage" occurs for the first claim arising from such "lot" [as defined in the Batching Endorsement].

. . . .

All other terms, conditions and exclusions remain unchanged.

*See* Decl., Ex. A, at 98; Ex. B, at 99.

**B.      The Underlying Claims Allege Damages from *Salmonella* Contamination**

Smucker faces thousands of Underlying Claims seeking damages because of alleged bodily injury occurring during one or both of the Policy periods.[3] ECF No. 11, ACE Answer, ¶ 27. The Underlying Claims include a consolidated putative class action pending before this Court, captioned *Naythan A. Ward v. J.M. Smucker Co.*, Case No. 5:22-cv-00885-JRA (the "Consolidated Complaint," which is attached as Decl., Ex. G).

As discussed in Section IV.A, below, ACE's defense obligations apply as long as the allegations made in the Underlying Claims potentially or arguably fall within the scope of coverage under the Policies. *See infra*, pp. 8–10. Here, ACE does not contest that the allegations in the Underlying Claims easily meet this standard, thus admitting that the Underlying Claims trigger its defense duty, subject to ACE's contentions relating to how many retained limits Smucker must pay before that duty kicks in. ECF No. 11, ACE Answer, ¶ 36.

---

[3] The Underlying Claims also include claims alleging Smucker's products damaged other manufacturers' products, which ACE also has acknowledged potentially are covered under the Policies. ECF No. 11, ACE Answer, ¶ 34. Because the issues are the same, this Motion typically omits references to damages because of "property damage."

C.   **ACE Refused to Pay for Smucker's Defense of the Underlying Claims**

Despite accepting that its defense duties apply, ACE refuses to pay Smucker's defense costs unless and until Smucker exhausts potentially hundreds of separate retained limits. ACE's reasoning for this contention has migrated from position to position over time.

In its initial coverage position letter, dated August 1, 2022, ACE acknowledged that all of the alleged injuries in the Underlying Claims arose from the "substantially same general harmful condition, cause, defect, error or suspected deficiency – namely, salmonella contamination." *See* Decl., Ex. C, at 4; *see also* ECF No. 11, ACE Answer, ¶ 41. In effect, ACE therefore initially accepted that the Underlying Claims arise from a single occurrence under the Policies. *Compare* Decl., Exs. A & B, at 66 (defining "occurrence" to mean "exposure to substantially the same general harmful conditions"), *with* ECF No. 11, ACE Answer, ¶ 41 (admitting the Underlying Claims arise from the "substantially same general harmful condition, cause, defect ….").

ACE, however, went on to assert that it nonetheless had no current coverage obligation because the Batching Endorsement effectively ***divides*** what otherwise would be a single cause (and, thus, a single occurrence under the Policies) into 225 separate occurrences—one for each "lot" of peanut butter produced by Smucker, with each "lot," according to ACE, encompassing a single 24-hour period of production and subject to ***its own*** $250,000 retained limit. Decl., Ex. C, at 4. ACE thus effectively claimed that the Batching Endorsement required Smucker to pay up to 225 separate deductibles, totaling as much as $56,250,000 for each Policy (or $112,500,000 under both Policies) before ACE has to pay anything towards Smucker's defense.

Smucker responded to ACE by explaining, among other things, that virtually every court faced with similar batching clauses has rejected ACE's assertion that the Batching Endorsement unambiguously applies to break up what otherwise would be a single occurrence. Decl., Ex. D, at 4–7. Among others, Smucker noted that in *ConAgra*, the Delaware Supreme Court rejected ACE's

7

precise argument (that a batching endorsement applies to claims arising out of multiple "lots"), under virtually identical facts. *Id.* at 6–7. Smucker further noted that ACE should have been aware of these cases long before it sold Smucker the Policies, and thus that ACE should have known that it was using language that Smucker reasonably would understand only to increase Smucker's coverage under the Policies, not to reduce or defeat that coverage. *Id.*

In response, ACE shifted gears. In a September 15, 2022 letter, ACE devised a different way of interpreting the Policies to reach the identical coverage-defeating result for Smucker. Decl., Ex. E. To be sure, ACE still admitted the Underlying Claims arose from "the substantially same general harmful condition[.]" *Id.* at 2. But this time ACE for the first time claimed that "each claimant's exposure to salmonella-contaminated peanut butter" was "a separate 'occurrence'" under the Policies' "occurrence" definition. *Id.* In other words, ACE claimed the Underlying Claims present thousands of occurrences under the Policies, not just a single occurrence. *Id.*

ACE then argued that the Batching Endorsement applied to reach the same result as its previous position—i.e., to require Smucker to pay up to 225 separate retained limits of $250,000 each before ACE has to pay anything towards Smucker's defense. This time, however, ACE claimed the Batching Endorsement **combines** what ACE now contended were thousands of occurrences (one for each claimant asserting an Underlying Claim) into 225 separate occurrences (one for each supposed "lot" of peanut butter). *Id.* Using different reasoning, ACE thus again relied on the Batching Endorsement to reach the same coverage-defeating conclusion: Smucker must pay up to $56,250,000 per Policy (up to $112,500,000 total) before ACE has any coverage obligation.

## IV. ARGUMENT

### A. The Duty to Defend and Summary Judgment Standards

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, no

genuine factual disputes exist. Smucker seeks partial summary judgment only with respect to ACE's defense obligations. An insurer's defense duty must be determined as a matter of law exclusively by comparing the allegations in the Underlying Claims to the terms of the Policies. *Ohio Govt. Risk Mgt. Plan v. Harrison*, 115 Ohio St. 3d 241, 245 (2007). As a result, Ohio courts treat the determination of insurer defense duties as a pure issue of law. *Doe v. Sherwin*, 2015-Ohio-2451, ¶ 11 (Ohio Ct. App. 2015) ("[A] decision granting or denying summary judgment based on interpretation of an insurance contract is a question of law.").

Insurers bear a heavy burden if they wish to escape their defense obligations because, under Ohio law, "[a]n insurer's duty to defend is broader than and distinct from its duty to indemnify." *Harrison*, 115 Ohio St. 3d at 245. The insurer's defense obligations are triggered whenever the underlying allegations "state a claim that <u>potentially</u> or <u>arguably</u> falls within the liability insurance coverage." *Id.* at 246 (emphasis added). If there is any "doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept the defense of the claim." *Willoughby Hills v. Cincinnati Ins. Co.*, 9 Ohio St. 3d 177, 180 (1984).

Moreover, promptly resolving ACE's defense obligations is critical because the defense dollars to which Smucker is entitled are often "the most important" part of a general liability policy. *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 112 Ohio St. 3d 482, 488 (2006). After all, Smucker paid ACE premiums to obtain the "peace of mind" that comes from having "litigation insurance." *Westfield Cos. v. O.K.L. Line*, 2001 WL 35905718, ¶ 34 (Ohio Com. Pl. 2001); *Ward v. Custom Glass & Frame, Inc.*, 663 N.E.2d 734, 737 (Ohio Ct. App. 1995).

For these reasons, Ohio federal courts routinely determine an insurer's defense obligations at an early stage of the litigation. *See, e.g.*, *FirstEnergy Generation, LLC v. Valley Forge Ins. Co.*, 487 F. Supp. 3d 630, 637 (N.D. Ohio 2020) (granting summary judgment on insurer's obligation

to defend policyholder); *ACE Euro. Grp., Ltd. v. Abercrombie & Fitch Co.*, 621 F. App'x 338, 344 (6th Cir. 2015) (affirming grant of insured's Rule 12(c) motion on duty to defend). Federal courts also routinely grant summary judgment where, as here, the only dispute involves determining the number of occurrences for purposes of the number of retained limits or deductibles that an insured must pay. *E.g.*, *Scott Fetzer*, 769 F. App'x at 328–29 (reversing district court's contrary ruling and ordering that summary judgment be granted to an insured on the number of occurrences issue).

Here, ACE admits that the Underlying Claims "potentially" seek damages covered under the Policies, subject to satisfaction of the Policies' retained limit. *See* ECF No. 11, ACE Answer, ¶ 52. Thus, the only issue this Court must resolve to determine ACE's defense obligations is whether it is reasonable to interpret the Policies to mean that the Underlying Claims at least "potentially" or "arguably" arise from a single occurrence. Because, as described below, it is at least reasonable that the Underlying Claims constitute a single occurrence under the Policies, this Court should grant Smucker partial summary judgment on the defense issue.

**B.**   **The Underlying Claims Arise from a Single Occurrence Because, as ACE Admits, They All Arise from the Same "Cause"**

The Policies define "occurrence" to mean an "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at ¶ 21. Here, ACE has repeatedly and affirmatively stated that the Underlying Claims "arise[] from the substantially same general harmful condition, <u>cause</u>, defect, error or suspected deficiency – namely, salmonella contamination." Decl., Ex. C, at 4; Ex. F, at 3 (emphasis added). ACE also admits this in its Answer. ECF No. 11, ACE Answer, ¶ 41.

ACE's admission that all Underlying Claims arise from the same "cause" leads inexorably to the conclusion that the Underlying Claims all arise from a single occurrence—"salmonella contamination." *See id.* Indeed, courts applying Ohio law typically use the "cause" test to

determine the number of occurrences in this context. *E.g.*, *Scott Fetzer*, 769 F. App'x at 328 ("Ohio law … follows the cause test."). Under the cause test, "the number of occurrences is determined by looking at the cause or causes of the damage or injury, rather than by looking at the number of individual claims." *Id.*; *see also Parker Hannifin Corp. v. Steadfast Ins. Co.*, 445 F. Supp. 2d 827, 832 (N.D. Ohio 2006); *Big Lots Stores, Inc. v. Am. Guarantee & Liab. Ins. Co.*, 240 F. Supp. 3d 725 (S.D. Ohio 2017).

Here, given that ACE admits that the injuries alleged in the Underlying Claims arise from a single "cause"—"namely, salmonella contamination," ECF No. 11, ACE Answer, ¶ 41—it is at least reasonable to conclude the Underlying Claims arise from a single occurrence. That is, and should be, the end of the inquiry here, because that is all that Smucker needs to show to prevail on the issue of ACE's defense duty—that Smucker's interpretation of the Policies is a reasonable one. And, based just on ACE's admission, it is at least reasonable that the Underlying Claims allege injuries that all arise from a single occurrence—that is, they arise from a single "accident," which the Policies define to include "repeated" (that is, multiple) exposures to "substantially the same general harmful conditions." Simply put, ACE's admission—that the Underlying Claims "arise[] from <u>the substantially same</u> general harmful <u>condition</u>, <u>cause</u>, defect, error or suspected deficiency – namely, salmonella contamination," Decl., Ex. C, at 4; Ex. F, at 3 (emphasis added)—is dispositive here.

## C.     ACE's Efforts to Avoid the Consequences of Its Own Coverage Admissions Fail

As noted, ACE admits that the Underlying Claims all arise from the same "condition" and "cause," which means they arise from the same "occurrence," as that term is defined in the Policies. Where there is a single occurrence, each Policy obligates Smucker to pay just a single per-occurrence retained limit of $250,000, after which ACE's defense obligations trigger. ACE attempts to avoid this result in two ways, neither of which has any merit.

11

1.    **The Batching Endorsement on Which ACE Relies Can Reasonably Be Interpreted to Decrease, but not Increase, the Number of Occurrences and Retained Limits**

Initially, ACE claimed it had no coverage obligation here because the Batching Endorsement divides what otherwise would be a single occurrence into as many as 225 separate occurrences (one for each "lot" of peanut butter), with each of those 225 occurrences subject to a separate $250,000 retained limit. *See* Decl., Ex. C. To the extent that ACE still asserts this argument, ACE's initial argument fails both under the Policies' plain language and longstanding case law. Indeed, more than a decade before ACE wrote and sold the Policies to Smucker, the Delaware Supreme Court, sitting *en banc*, rejected this argument, based on materially identical policy language and facts. *ConAgra*, 21 A.3d 62.

Like this case, *ConAgra* involved an insurer's refusal to cover a peanut butter manufacturer for thousands of underlying claims arising out of alleged *Salmonella* contamination. *Id.* at 64. Like ACE's Policies, the policy in *ConAgra* contained a lot or batch clause endorsement that the insurer used to argue that the underlying claims arose from hundreds of separate lots and thus hundreds of separate occurrences, each subject to a separate deductible. *Id.* But the Delaware Supreme Court rejected that argument, holding that the batching provision was ambiguous and reasonably could be interpreted as being intended only to expand coverage by reducing, not increasing, the number of occurrences. *Id.* at 72. Thus, the insurer's duty to defend the underlying peanut butter claims triggered as soon as the insured satisfied a single per-occurrence limit. *Id.* at 73.[4]

It is hard to imagine a more factually analogous case than *ConAgra*. Moreover, further support abounds for Smucker's position, with courts across the country overwhelmingly holding

---

[4] The jury in *Conagra* subsequently returned a verdict at trial finding that the policy in question applied as Conagra intended. *See ConAgra Foods, Inc. v. Lexington Ins. Co.*, Case No. SN09C-02-170, Final Judgment Order After Trial, at 2 (Del. Super. Ct., Nov. 30, 2012) (*see* Decl., Ex. I).

that provisions like the Batching Endorsement are intended to maximize coverage by minimizing the number of occurrences or, at the very least, that such a conclusion is a reasonable interpretation of ambiguous policy language. *See, e.g., Nationwide Mutual Ins. Co. v. Lafarge Corp.*, Civ. Nos. H–90–2390, H–93–4173, Bench Op. (D. Md. Oct. 31, 1995) (*see* Decl., Ex. H) ("The purpose of a batch clause is to limit the number of occurrences, not to expand it."), *aff'd and adopted*, 121 F.3d 699, 1997 WL 532509, at *4 (4th Cir. 1997); *Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.*, 609 A.2d 440, 480 (N.J. Super. App. Div. 1992) (noting batching provisions are intended "to minimize the number of occurrences in order to maximize coverage"); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Donaldson Co., Inc.*, 926 F.3d 1014, 1021 (8th Cir. 2019) (concluding "the main purpose of batch clauses … is to reduce the number of occurrences whenever the same product causes multiple bodily injuries"); *Union Carbide Corp. v. Travelers Indem. Co.*, 399 F. Supp. 12, 20–21 (W.D. Pa. 1975) (declining to apply a "lot" provision to break claims against a manufacturer into separate occurrences).

In sum, long before ACE drafted the Policies, numerous courts had interpreted batching provisions like the Batching Endorsement to increase coverage, not reduce or defeat it. ACE, as a sophisticated insurer, is deemed to know the law at the time that it wrote the Policies, which are "implied terms of the contract." 11 WILLISTON ON CONTRACTS, § 30:19 (4th ed. 2023) ("[C]ontractual language must be interpreted in light of existing law, the provisions of which are regarded as implied terms of the contract[.]") (footnote omitted). Had ACE meant the Batching Endorsement to have a different meaning than what numerous courts have held, ACE had to make its intent clear and unambiguous. *See, e.g., U.S. Specialty Ins. Co. v. Drake Aerial Enters., LLC*, 328 F. Supp. 3d 781, 784 (N.D. Ohio 2018). Instead, ACE used the same language that cases like *ConAgra* had already determined reasonably apply to expand coverage and not reduce it. ACE is

13

bound by the consequences of its decision. *See George H. Olmsted & Co. v. Metro. Life Ins. Co.*, 118 Ohio St. 421, 427–28 (1928) (ruling against insurer that included policy language about which there was a split in authority).

### 2.    Contrary to ACE's Contentions, Claims Arising from the Same Cause Constitute a Single Occurrence

Perhaps recognizing that its initial interpretation of the Batching Endorsement has repeatedly been rejected, ACE later pivoted to argue that, notwithstanding its admission that the Underlying Claims all arise from the same "cause," each Underlying Claim effectively constitutes its own separate occurrence under the Policies. Decl., Ex. E, at 1–2. ACE thus effectively contends that, absent the Batching Endorsement, the Policies would require Smucker to pay a separate $250,000 deductible for each of the thousands of Underlying Claims. *Id.*

This itself would effectively eviscerate coverage under the Policies, so ACE then invokes the Batching Endorsement, this time using it to combine the thousands of Underlying Claims into one occurrence for each "lot" of peanut butter. Thus, instead of using the Batching Endorsement to divide up a single occurrence, ACE's new argument uses the Batching Endorsement to aggregate purportedly thousands of occurrences. But, ACE does so to reach the exact same coverage-eviscerating result as its previous position—that there are up to 225 separate occurrences, one for each "lot" of peanut butter, such that Smucker must pay up to 225 separate retained limits of $250,000 each. *Id.*

This position, too, is inconsistent with Ohio law. As discussed above, the Policies define "occurrence" to mean an "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Decl., Exs. A & B, at 66. And, ACE has admitted that the Underlying Claims all "arise[] from the substantially same general harmful condition" and "cause" – "namely, salmonella contamination." ECF No. 11, ACE Answer, ¶ 41.

This admission is fatal to ACE's latest argument because, as noted, to prevail on this Motion, Smucker only needs to establish that its interpretation—that the Underlying Claims constitute a single occurrence under the Policies—is a reasonable one, not the only, or even the most, reasonable interpretation of the Policies. *See World Harvest Church v. Grange Mut. Cas. Co.*, 148 Ohio St. 3d 11, 18 (2016). Given ACE's admissions that the Underlying Claims arise out of a single "cause" and Ohio's use of the "cause" test to determine the number of occurrences under an insurance policy, it is at least a reasonable interpretation of the Policies that the Underlying Claims all arise out of a single occurrence.

ACE, on the other hand, must show that its interpretation—that each of the thousands of Underlying Claims is itself its own occurrence, which the Batching Endorsement combines into 225 occurrences, one for each "lot" of peanut butter—"is the only reasonable interpretation" of the Policies. *Scott Fetzer*, 769 F. App'x at 326 ("an insurer attempting to defeat coverage must show that its interpretation of the insurance contract is the only reasonable interpretation"). Any provision that is reasonably susceptible to more than one interpretation is ambiguous and is "construed strictly against the insurer and liberally in favor of the insured." *Id.* ACE cannot meet this burden here for several reasons.

*First*, the majority of courts applying Ohio law in this context have held that bodily injury claims that result from an insured's defective manufacturing of a product all arise from a single occurrence. For example, in *Parker Hannifin*, the court rejected an insurer's argument that each sale or shipment of a product was a separate occurrence subject to a separate deductible. *Parker Hannifin*, 445 F. Supp. 2d at 831–32. Instead, faced with an identical definition of the term "occurrence" as the Policies here, the court ruled there was only a single occurrence, which was "the malfunction of [the insured's] gaskets." *Id.* In so holding, the court explained that "[n]umerous

15

courts have recognized that the calculation of the number of occurrences must focus on the underlying <u>circumstances</u> which resulted in the personal injury and claims for damage rather than each individual claimant's <u>injury</u>." *Id.* at 832 (emphasis in original) (quotations omitted).

Similarly, in *MTD Products*, an Ohio court granted summary judgment for an insured manufacturer of snow blowers, ruling that, under an identical definition of "occurrence" to the one in the Policies here, there was only a single occurrence or accident: "producing a defective product." *MTD Products, Inc. v. Allied World Assurance Co.*, 2018 WL 2447408, at *9 (Ohio Com. Pl. 2018). Many other courts applying Ohio law have reached the same conclusion.[5]

*Second*, courts outside Ohio have similarly interpreted "occurrence" to conclude that multiple individuals' distinct exposures to harmful products arise from a single occurrence. This precise factual scenario was at issue in the *ConAgra* case, where the Delaware Supreme Court explained that, under the cause test, there would be "only one occurrence, because the bodily injury claims arose collectively out of one cause—salmonella-tainted peanut butter made in one plant." *ConAgra*, 21 A.3d at 67 (quotation omitted). Many other courts have reached the same conclusion and have held that claims for injuries caused by food contamination arise from a single occurrence,

---

[5] *E.g.*, *Goodyear Tire and Rubber Co. v. Hartford Acc. and Indem. Co.*, 2005 WL 6244202 (W.D. Pa. 2005) (applying Ohio law) (manufacturing of various asbestos products constituted a single occurrence); *Morton Thiokol, Inc. v. Aetna Casualty & Surety Co.*, 1988 WL 1520456 (Ohio Ct. C.P. 1988) (holding that the decision to manufacture and distribute asbestos products constitutes a single occurrence), *rev'd on other grounds,* 1991 WL 201651 (Ohio Ct. App. 1991); *Owens-Illinois, Inc. v. Aetna Cas. and Sur. Co.*, 597 F. Supp. 1515, 1525 (D.D.C. 1984) (applying Ohio law) (the manufacturing and sale of asbestos products constituted a single occurrence); *Int'l Surplus Lines Ins. Co. v. Certain Underwriters and Underwriting Syndicates at Lloyd's of London*, 868 F. Supp. 917 (S.D. Ohio 1994) (ruling that an insurer's decision was reasonable when it provided coverage to insured on a single occurrence basis for claims arising out of insured's manufacturing of asbestos products); *Libbey Inc. v. Factory Mut. Ins. Co.*, 2007 WL 9757792 (N.D. Ohio 2007) (claims arising from the defective production of lubricating oil constituted a single occurrence under a property policy); *see also Scott Fetzer*, 769 F. App'x 322 (separate negligent supervision claims arose from a single occurrence).

even when they arise from different batches of food prepared on different days, which injured different claimants.[6]

*Third*, ACE's admission—that the Underlying Claims all arise from the same condition and cause—makes this case markedly different from those on which ACE has previously relied in correspondence with Smucker, because all of those cases involved factual disputes over whether the underlying claims at issue actually arose from the same condition or cause. For example, in the primary case on which ACE relied in its September 15, 2022 letter to Smucker, the court specifically explained that the exposures to the insured's products "did not constitute the 'same general conditions.'" *William Powell Co. v. Onebeacon Ins. Co.*, 2016-Ohio-8124 (Ohio Ct. App. 2016). The courts in the other cases that ACE cited to Smucker likewise only found multiple occurrences existed after concluding that the underlying claims arose from "unique conditions and circumstances." *See Westfield Ins. Co. v. Cont'l Ins. Co.*, 2015 WL 1549277, at *7 (N.D. Ohio 2015); *LuK Clutch Sys., LLC v. Cent. Indem. Co.*, 805 F. Supp. 2d 370, 380 (N.D. Ohio 2011) (involving "hundreds of different customers around the country who were exposed to the asbestos-laden product in inevitably different situations").

Moreover, nearly all courts that have found multiple occurrences exist in the context of product liability claims under Ohio law have done so in situations where the ruling granted the policyholder ***more*** coverage than a ruling of a single occurrence would have provided. This approach is consistent with, and driven by, the principle that insurance policies should be interpreted "such as not to defeat, without a plain necessity, the insured's claim to the indemnity

---

[6] *E.g.*, *Travelers Cas. Ins. Co. of Am. v. Mediterranean Grill & Kabob Inc.*, 499 F. Supp. 3d 371, 373 (W.D. Tex. 2020) (applying Texas law) (under the cause test, 124 separate cases of food poisonings over a multi-day period were caused by a single occurrence, even though the injuries arose from different batches of food prepared on different days); *Republic Underwriters Ins. Co. v. Moore*, 493 F. App'x 907, 912 (10th Cir. 2012) (applying Oklahoma law) ("Here, all the injuries were proximately caused by the restaurant's ongoing preparation of contaminated food. Hence, there was but one occurrence.").

which it was his object to secure and for which he paid a premium." *Clements v. Aetna Cas. & Sur. Co.*, 15 Ohio Misc. 252, 256 (Ohio Com. Pl. 1968) (quotation omitted). In fact, in the very few cases in which a court applying Ohio law arguably interpreted "occurrence" in a manner that reduced coverage, the facts are easily distinguishable.[7] In contrast, in at least a dozen other cases, courts applying Ohio law interpreted "occurrence" to maximize coverage.[8]

At minimum, the fact that a significant majority of courts have adopted Smucker's interpretation shows that, at best for ACE, the term "occurrence" is ambiguous because it is subject to more than one reasonable interpretation. Indeed, the Sixth Circuit held exactly that recently, finding under Ohio law that the term "occurrence" is ambiguous under the identical definition of "occurrence" as the one ACE included in Smucker's Policies. *Scott Fetzer*, 769 F. App'x at 327.

The Ohio Supreme Court has also recognized that conflicting rulings, even from other jurisdictions, can evidence the ambiguity of insurance language. *See Olmsted*, 118 Ohio St. at 427–28 (refusing to find insurance provision unambiguous, in part because many courts in various jurisdictions interpreted the provision in two different ways, which "presents such persuasive argument of the ambiguity of the clause"); *Goolsby v. Best in Neighborhood, LLC*, 563 F. Supp. 3d 726, 736 (N.D. Ohio 2021) (applying Ohio law) (a "wide-ranging conflict [in the interpretation

---

[7] *See Big Lots*, 240 F. Supp. 3d at 734 (the insured was not a manufacturer of the product and the court ultimately ruled that the per-occurrence retained limit was not applicable, so its ruling on the number of occurrences did not actually reduce the insured's coverage); *Babcock & Wilcox Co. v. Arkwright-Boston Mfg. Mut. Ins. Co.*, 53 F.3d 762 (6th Cir. 1995) (interpreting a materially different "occurrence" definition drafted by the insured, which required the occurrence to be an event during the policy period).

[8] *See MTD Products*, 2018 WL 2447408; *Goodyear*, 2005 WL 6244202; *Parker Hannifin*, 445 F. Supp. 2d 827; *Owens-Illinois*, 597 F. Supp. 1515; *Int'l Surplus Lines*, 868 F. Supp. 917; *Libbey*, 2007 WL 9757792; *William Powell*, 2016-Ohio-8124; *Westfield*, 2015 WL 1549277; *LuK Clutch*, 805 F. Supp. 2d 370; *Cincinnati Ins. Co. v. ACE INA Holdings, Inc.*, 175 Ohio App. 3d 266, 279 (Ohio Ct. App. 2007); *see also Morton Thiokol*, 1988 WL 1520456 (involving a retrospective premium adjustment).

of an exclusion] itself is – although not definitive – at least supportive persuasive evidence of the exclusion's ambiguity as applied to lead-based paint.").

In short, ambiguities must be construed in favor of defense coverage. Any ambiguity in the meaning of the term "occurrence" is thus an independent basis that merits partial summary judgment in Smucker's favor here. *E.g.*, *Scott Fetzer*, 769 F. App'x at 323, 326.

Because it is at least reasonable that all of the bodily injury claims against Smucker arise out of a single cause, and thus a single occurrence, the Batching Endorsement has no application here.[9] As discussed above, the Batching Endorsement does not sever what otherwise would be a single occurrence into multiple occurrences. Nor does the Batching Endorsement somehow replace, modify or override the clause in the "occurrence" definition that makes clear that "repeated" (that is, multiple) exposures to the same condition or cause (here, *Salmonella* contamination) constitute a single occurrence. In fact, the Batching Endorsement expressly repudiates any such result by stating that "all other terms … remain unchanged." Decl., Ex. A at 98; Ex. B. at 99.

---

[9] Just because the Batching Endorsement has no impact here does not mean it is superfluous or could never apply in a different case. For example, states other than Ohio might—as Ohio courts in vastly different contexts than this one do—use tests besides the "cause" test to determine the number of occurrences. Those courts might therefore conclude that, without a provision like the Batching Endorsement, there would be multiple occurrences in a situation like this one. The Batching Endorsement thus might play a crucial role in avoiding a coverage-defeating result in such a case. But that is not this case: Ohio law does, in fact, apply the "cause" test in this context, ACE has admitted that the Underlying Claims all arise from the same "cause," and thus there is only one occurrence here as a matter of Ohio law. The Batching Endorsement simply does not apply.

## V.     **CONCLUSION**

For the foregoing reasons, Smucker respectfully requests that this Court issue an order granting its Motion for Partial Summary Judgment and enter judgment holding that: (i) the Underlying Claims arise from a single occurrence under the Policies; and (ii) once Smucker has satisfied a single $250,000 retained limit per Policy, ACE is obligated to reimburse Smucker for all defense costs that Smucker has incurred or will incur defending the Underlying Claims.

Dated: August 4, 2023                              Respectfully Submitted,

/s/ *Matthew A. Chiricosta*
K. James Sullivan (0074211)
Matthew Chiricosta (0089044)
Fritz E. Berckmueller (0081530)
**CALFEE, HALTER & GRISWOLD LLP**
The Calfee Building
1405 East Sixth Street
Cleveland, OH 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
KJSullivan@Calfee.com
MChiricosta@Calfee.com
FBerckmueller@Calfee.com

Jonathan Cohen (admitted *pro hac vice*)
Brian Koosed (admitted *pro hac vice*)
Erin Fleury (admitted *pro hac vice*)
**K&L GATES LLP**
1601 K Street, N.W.
Washington, DC 20006
Telephone: (202) 778-9000
Facsimile: (202) 778-9100
Jonathan.Cohen@klgates.com
Brian.Koosed@klgates.com
Erin.Fleury@klgates.com

*Attorneys for The J.M. Smucker Company*

## LOCAL RULE 7.1(f) CERTIFICATION

Under LR 7.1(f), I certify that this case is assigned to the Standard Track.  Under LR 7.1(f),

memoranda relating to dispositive motions in Standard Track cases must not exceed 20 pages

except in extraordinary circumstances.  I certify that the foregoing Brief adheres to the 20-page

limit, exclusive of the cover page, tables, and certificates.


 /s/ *Matthew A. Chiricosta*
One of the Attorneys for Smucker

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing, *Brief on Behalf of Plaintiff, The J.M. Smucker Company, in Support of its Rule 56 Motion for Partial Summary Judgment*, has been filed electronically on August 4, 2023 with the United States District Court for the Northern District of Ohio.  Notice of the filing will be sent by email to all counsel by operation of the Court's electronic filing system and all parties may access this filing through that system.

_/s/ Matthew A. Chiricosta_____
One of the Attorneys for Smucker